IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Susan Gaddy,<br><br>              Plaintiff,<br><br>vs.<br><br>The Guardian Life Insurance Company<br>of America, Berkshire Life Insurance<br>Company of America, and Consolidated<br>Planning, Inc.,<br><br>              Defendants. | Civil Action No. 6:09-837-HMH-KFM<br><br><br><br>**ORDER AND**<br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendants' motions for summary judgment (docs. 80, 97), the plaintiff's motions for summary judgment (docs. 84, 124, 133), and several nondispositive motions (docs. 103, 104, 109, 111, 127).

Defendants The Guardian Life Insurance Company of America ("Guardian") and Berkshire Life Insurance Company of America ("Berkshire") issued the plaintiff a disability income policy and an overhead expense disability income policy. Berkshire is a wholly-owned stock subsidiary of Guardian (referred to collectively hereinafter as "Berkshire/Guardian"). Defendant Consolidated Planning, Inc.'s ("Consolidated") agent sold the policies to the plaintiff. The plaintiff, who is an attorney licensed to practice law in this state and who is proceeding *pro se,* alleges in her complaint that the defendants "have failed to provide the benefits due and owing under the policies." Defendants Berkshire/ Guardian have counterclaimed for declaratory judgment that the plaintiff has not suffered any disabling injury or sickness and is not owed any benefits under the policies.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02)(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

On January 22, 2010, Consolidated filed a motion for summary judgment (doc. 80). On that same date, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences if she failed to respond adequately. The plaintiff filed her opposition on February 1, 2010. On January 25, 2010, the plaintiff filed a motion for summary judgment as to Consolidated (doc. 84). Consolidated responded to the plaintiff's motion on February 9, 2010.

On February 16, 2010, Berkshire/Guardian filed a motion for summary judgment (doc. 97). Another *Roseboro* order was issued on that same date. The plaintiff filed her opposition to the motion on March 22, 2010. On March 17, 2010, the plaintiff filed a motion for summary judgment as to Berkshire/Guardian (doc. 124). On March 31, 2010, the plaintiff filed an amended motion for summary judgment. (doc. 133). Berkshire/Guardian filed their opposition to the original motion on April 5, 2010, and to the amended motion on April 19, 2010. Consolidated also filed opposition to the amended motion for summary judgment on April 19, 2010. The plaintiff has also filed several nondispositive motions: two motion for sanctions (docs. 103, 111), motion to compel (doc. 104), motion to vacate (doc. 109), and motion to consolidate cases (doc. 127). The defendants have filed opposition to all the plaintiff's nondispositive motions.

## **FACTS PRESENTED**

In May 14, 2001, the plaintiff purchased a Disability Income Policy and an Overhead Expense Disability Income Policy from Berkshire/Guardian. Consolidated was the agent and broker for these policies. The Disability Income Policy was designed to pay

monthly benefits to the plaintiff upon satisfaction of the conditions of the policy. The Overhead Expense Policy was designed to pay monthly overhead expenses to the loss payee, Gaddy Law Firm, LLC, upon meeting certain conditions. The plaintiff acknowledges she is bound by the terms and conditions of these two contracts (Berkshire/Guardian m.s.j., ex. 1, pl. dep. 453-54, 458-60; ex. 2, 3). The plaintiff's complaint alleges that she filed a claim for disability benefits that she admitted in deposition is not a claim for total disability benefits but rather a claim for residual disability (i.e., a partial disability) since August 17, 2005 (pl. dep. 93). To receive benefits for a residual disability under the Disability Income Policy, one must meet this definition:

> **Residual Disability** means that you are at work and are not totally disabled under the terms of this policy but, because of sickness or injury, your loss of income is at least 20% of your prior income.

(Berkshire/Guardian m.s.j., ex. 2).

To be eligible for residual disability benefits under the Overhead Expense Policy, the following definition must be satisfied:

> **Residual Disability** means that you are at work and are not totally disabled under the terms of the policy; but, because of sickness or injury, your gross income is less than your current covered expenses.

(*Id.*, ex. 3).

As the definitions indicate, the claimed "sickness" must also be the cause of a certain degree of income loss or, in the case of the Overhead Expense Policy, the "sickness" must cause the gross income of the Gaddy Law Firm, LLC, to be less than its "current covered expenses" on a monthly basis. The term "sickness" has the same meaning in both policies: "a sickness or disease which is diagnosed and treated while this policy is in force."

If one's disability is due to the same sickness as a previous claim, one can recover benefits for that condition as long as the recovery was less than six months:

> **Recurrent Periods of Disability**
> After the elimination period has been satisfied, we will consider recurrent periods of disability to be one continuous period of disability if they result from the same cause or causes and are not separated by a recovery of more than six months. If a recurrent period of disability arises from a different cause, we will consider your loss to be separate and unrelated period of disability.

(*Id.*, ex. 2, 3). In those instances, the benefits for a recurrent disability are subject to the policy maximum of 60 months set out in the Disability Income Policy and the $60,000 maximum aggregate benefit in the Overhead Expense Policy (*id.*).

The policies issued to the plaintiff contain a "Physical Impairment Rider" attached to the policy form in which the parties agreed that no claim would be covered that resulted from any mental or nervous disease or disorder. Specifically, the rider "shall not cover nor shall any payment be made for":

> LOSS RESULTING FROM ANY DISABILITY CONTRIBUTED TO OR CAUSED BY ANY MENTAL OR NERVOUS DISEASE OR DISORDER INCLUDING BUT NOT LIMITED TO: PSYCHOSIS, ANXIETY, DEPRESSION, OR ANY MENTAL, EMOTIONAL, COGNITIVE, ADJUSTMENT, OR MOOD DISORDER, OR CHRONIC FATIGUE SYNDROME OR ANY SOMATIC COMPLAINTS ARISING THEREFORE; AS WELL AS ANY MENTAL OR NERVOUS DISORDER DESCRIBED AND LISTED IN THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER PUBLISHED BY THE AMERICAN PSYCHIATRIC ASSOCIATION (A.P.A). OR ANY SUBSEQUENT REPLACEMENT PUBLICATIONS CHOSEN BY THE A.P.A.

(*Id.*) (capitalization in original).

The plaintiff previously filed a claim for residual disability benefits on December 2, 2002, less than two years after her application. That claim arose from a combination of a miscarriage and a "rear end collision; bodily injuries to neck, shoulders,

and back" (pl. dep. 231, 234-35; Berkshire/Guardian m.s.j., ex. 4). The plaintiff's miscarriage occurred on or about August 17, 2002 (pl. dep. 231). Her gynecologist, Dr. Demosthenes, released her to work on September 10, 2002, less than 30 days later (*id.* 232-33). The plaintiff's automobile accident occurred October 4, 2002 (Berkshire/Guardian m.s.j., ex. 5). It caused minor damage to the rear bumper of the plaintiff's vehicle, requiring no body repair (pl. dep. 55-56). The plaintiff still owns and drives that vehicle (*id.*). The airbag in the plaintiff's car did not deploy (*id.* 238). She drove herself from the accident scene to her doctor's office for examination (*id.* 235).

The plaintiff's physician diagnosed her with neck, shoulder, and back pain following the accident (*id.* 237; Berkshire/Guardian m.s.j., ex. 6). The plaintiff also complained that she was having problems concentrating and processing and analyzing information after the accident (pl. dep. 308-309; Berkshire/Guardian m.s.j., ex. 7,8). As a result of the combined effects of the automobile accident and miscarriage, Berkshire/ Guardian approved the plaintiff's claim for residual disability benefits. It sent her monthly residual disability benefit checks for a period of two years, from November 2002 to October 2004, totaling in excess of $130,000.

While receiving residual disability benefits, the plaintiff continued to work as an attorney. She was one of seven lawyers or firms who were class counsel in the Carolina Investors class action lawsuit, a contingency fee case (pl. dep. 275-87). In that capacity, she met with "thousands" of claimants in her office (*id.* 275-77). The plaintiff admits telling one of her co-counsel in 2004 that she wanted to quit her law practice (*id.* 311). The class action was settled in the fall of 2004, at which time the plaintiff received an attorney's fee of approximately $1.2 million dollars (*id.* 187-88). Upon collecting that fee, the plaintiff elected to conclude her disability claim on October 13, 2004, and signed a release of Berkshire/Guardian (Berkshire/Guardian m.s.j., ex. 9). As consideration for that release, the plaintiff received an additional $8,220.60, which represented two more months of

5

disability benefits and the balance of her overhead policy benefits (pl. dep. 252). The release provided in part as follows:

> [The plaintiff does] hereby fully, finally, and unconditionally release and forever discharge Guardian, its affiliates, predecessors, successors, assignees, subsidiaries, its third party administrators (including Berkshire Life Insurance Company of America) . . . from any and all claims, demands, liabilities, agreements, . . . arising out of or in any way related to the Claim under the Policy . . .
>
> I acknowledge that this payment is being made at my request in order to settle the Claim. I understand that I am not waiving any right to receive benefits due to any future disability, including disability arising from or related to the disability that gave onset to the Claim. However, I understand that I shall not be entitled to any such benefits unless I have first satisfied all policy provisions, including but not limited to, any recurrent disability, concurrent disability or return to work provisions in the Policy.
>
> I understand that there is a risk that subsequent to the execution of this Agreement I may incur or suffer losses, damages or injuries which are in some way caused by or related to matters which are the subject of this Agreement, but which are unknown or unanticipated at the time of the execution of this Agreement. I understand that there is a risk that a loss or damage presently known may be or may become greater than I now expect or anticipate. Nevertheless, I agree to and hereby do release the Claim under the Policy.

(Berkshire/Guardian m.s.j., ex. 9).

In early 2005, the plaintiff began investing in real estate, buying three investment properties in the Charleston area with the expectation of reselling them (pl. dep. 20-21). After settling the Carolina Investors case, she did not have a significant amount of billable work in 2005 (*id.* 172-173). She did not have a regular referral source of legal matters as of August 2005 (*id.* 199). She had one remaining case of any size, which was a Toyota product liability case from which she eventually was fired by the clients in August 2005 (*id.* 185). Besides the Toyota case, the plaintiff's practice consisted only of three divorce cases and some "probate administration estates" and "real estate transactions" in

August 2005 (*id*. 182).  The plaintiff testified that her real estate investments immediately began to lose value and are currently in foreclosure (*id.* 12-13, 71-72).

Ten months after settling her previous Guardian claim, on August 17, 2005, the plaintiff went to her regular physician, Dr. Wallace, complaining of unspecified "back pain" with an associated symptom of fatigue (Berkshire/Guardian m.s.j., ex. 10; pl. dep. 254-55).  Dr. Wallace's chart from this visit contains a note stating she "wants to quit law practice and go on disability," which the plaintiff does not dispute telling him (Berkshire/ Guardian, ex. 10; pl. dep. 257).  A week after telling Dr. Wallace she wanted to quit her law practice, the plaintiff contacted Berkshire/Guardian on August 24, 2005, asking to "re-open" her claim from the 2002 automobile accident as a claim for residual disability (Berkshire/ Guardian m.s.j., ex. 11).  On September 19, 2005, the plaintiff signed and submitted a new Disability Claimant's Statement (*id.*, ex. 12).  The statement listed her disability as the injury from her "rear-end collision" on October 4, 2002, which she stated caused "bodily injuries to neck, shoulder and back" (*id.*; pl. dep. 296-97).  She also noted that this injury resulted in a "prior disability period 08/02-10/04" (Berkshire/Guardian m.s.j., ex. 12).  She also attached some of the same typewritten statements that were included in her original 2002 claim (*id.*).

The next day, on September 20, 2005, the plaintiff saw another doctor, Dr. David Shallcross, complaining of "chronic back pain for the last three years" dating to a motor vehicle accident on October 4, 2002 (*id.*, ex. 13).  Dr. Shallcross' chart states, "Ms. Gaddy reports that at this point the stress associated with her job causes her to experience neuropathic pain" (*id.*).  "Ms. Gaddy reports that her pain only seems to be present when she is under stress in the work environment" (*id.*).  "At this point she states that she is losing money in her practice and wants the disability to be resumed" (*id.*).  The plaintiff does not dispute these statements to Dr. Shallcross and further testified she yelled at him because he stated that he did not think anything was wrong with her (pl. dep. 301-307).

7

The plaintiff again returned to Dr. Wallace's office on October 4, 2005, complaining of "back pain" with an additional complaint of "memory loss" attributable to her "rear-end collision" three years earlier (Berkshire/Guardian m.s.j., ex. 14; pl. dep. 307-11). She admits telling Dr. Wallace, as indicated in his chart, that her symptoms were "aggravated by stress" in her work, as well as "problems with her parents," which the plaintiff described as her mother coming to her office demanding money (*id.*). She also acknowledges repeating her desire "to quit law practice and go on disability" as indicated in the chart (pl. dep. 310-11). That same day, the plaintiff sent Guardian a letter enclosing an "Attending Physician Statement" she had obtained from Dr. Wallace (Berkshire/ Guardian m.s.j., ex. 15). The doctor's statement says the plaintiff's symptoms first appeared "10-4-02" and were related to her 2002 "rearend collision" (*id.*). Where the form asks for a medical diagnosis, the form is blank – the doctor did not give one (*id.*).

The plaintiff admits in her deposition that the information in her Attending Physician's Statement and corresponding medical records indicates that her claim was a recurrence of the same claim and symptoms from her 2002 automobile accident:

> Q. Would you also agree that all of the information in the doctor's records that were being sent to Guardian Berkshire at this time, also indicated that your symptoms are symptoms which related back to the automobile accident?
>
> A. Yes. Everything that you showed me is consistent with what you're talking about.

(Pl. dep. 315).

> Q. Does the claim form on your disability claimant's statement at the top state that it is a claim of disability arising from an injury specifically relating to the automobile accident back in 2002?
>
> A. Yes.
>
> Q. And if that is the case, then would you agree that this would be a recurrence of a claim that you had already previously filed?

8

A. Yes.

(*Id.* 296-297, 300-301; Berkshire/Guardian m.s.j., ex. 9). Further, she admits it was reasonable for Berkshire/Guardian to at least question whether the August 2005 claim relates back to her earlier claim that she previously had released in October 2004 (pl. dep. 314-16). Such claim indisputably was not filed within six months of the previous claim, as required to be treated as a "Recurrent Disability" under the terms of the policies.

A telephone conversation followed on October 17, 2005, between the plaintiff and Claims Consultant Sam Haupt in which the plaintiff does not dispute discussing whether her claim was a recurrence of her 2002 claim (*id.* 322-24). The next day the plaintiff called and left a voice message for Haupt asking to change her claimed date of disability to "use June 2, 2005, as a working date of disability for a new event" (Berkshire/Guardian, ex. 16). In her deposition, the plaintiff described the "event" as "a sexual harassment incident that caused me distress" (pl. dep. 323). In her voice message, she advised that "the new claim would consist of the following type characteristics: migraine headaches with respect to neurological deficits such as loss of motor control, confusion, dizziness, exhaustion, back pain, sleep deprivation and memory loss." (Berkshire/Guardian, ex. 16). Two weeks later, the plaintiff listed some of these same symptoms on a visit to a neurologist, Dr. Cunningham, on November 4, 2005 (*Id.*, ex. 17). She does not dispute telling Dr. Cunningham that her symptoms began earlier in "late April" (not June), citing "confusion" about when the symptoms first appeared (pl. dep. 324-25). She also does not dispute, but says she cannot recall, whether she made a statement that appears in Dr. Cunningham's chart: "She states that she was trying to relocate to the beach to try and recuperate and take it easy for a while" (*id.* 325-26).

Berkshire field representative John Vick personally met with the plaintiff on November 30, 2005 (Berkshire/Guardian m.s.j., ex. 18; pl. dep. 328-34). During this meeting, they discussed the similarities between the plaintiff's 2002 disability claim and her

2005 disability claim and went over the "Recurrent Periods of Disability" provisions of the policies (*id.*).

The plaintiff submitted a new "Disability Claimant's Statement" on January 12, 2006, asserting a new onset date for her residual disability, which she gave as "8/17/05" (Berkshire/Guardian m.s.j., ex. 19). In answer to the "Nature of Disability" she listed a "sickness" described as "neurological deficit, cognitive problems" with symptoms first appearing "in summer 2005" (*id.*). In response to a question about her "Gross monthly earned income prior to disability," she answered, "none since 2004" (*id.*). Dr. Wallace's Attending Physician Statement accompanying the Disability Claim Statement diagnosed the plaintiff with "memory loss" but did not give a standard diagnosis code or identify any clinical diagnosis for the "memory loss" (*id.*). In response to a question about her "Prognosis for return to work," the doctor answered, "already working" (*id.*).

The plaintiff admits that after her January 9 visit to Dr. Wallace to obtain a new Attending Physician's Statement, she did not again see a doctor for the conditions described in her new claim until October 2006 (pl. dep. 340-59). During the intervening ten months the plaintiff admits the only doctors she saw were to treat her allergy problems (*id.*). She further admits notifying Guardian by voice message only a month after her claim, on February 23, 2006, that she had determined she was not disabled from work. The message stated, in pertinent part, as follows:

> Hi Sam, this is Susan Gaddy. . . . I have good news for you. I do not believe that I am now disabled as to my work. . . . I figured out that I have had a bad reaction which, what I would say is a severe allergic reaction, to Zyrtec which I was taking in response to a decongestant and cold medicine that I took one time in January.

(Berkshire/Guardian m.s.j., ex. 20). Consistent with her voice message, and confirmed in her deposition testimony in this case, the plaintiff's records disclose that from January 2006 until October 2006 she sought treatment only for allergy-related problems (pl. dep. 347-60,

10

Berkshire/Guardian m.s.j., ex. 21-24).  During those months, she also continued to tell her doctors that she wanted to quit her law practice and relocate to Charleston to invest in real estate (pl. dep. 342-43, 362; Berkshire/Guardian m.s.j., ex. 21, 24).

In April 2006, the plaintiff closed her Greenville law practice and moved to Charleston, South Carolina (pl. dep. 295-96, 423).  In a January 2007 letter to Guardian, the plaintiff noted that she relocated to Charleston "to obtain appropriate medical care, reduce the stress I experienced from work and family in Greenville, and improve my health through exercise and lifestyle changes" (*id.* 366-67).  After notifying Guardian on February 23, 2006, that she no longer was disabled, the plaintiff never submitted a new date of disability when she claims to have become residually disabled from working.  She does not know what medical records were submitted to Berkshire/Guardian after February 23, 2006 (*id.* 399-402).  The plaintiff acknowledges that Berkshire/Guardian continued to remain in contact with her about the basis of her claim and that Berkshire/ Guardian requested to meet with her personally and communicated with both her and her attorneys in writing on multiple occasions (*see, e.g.,* Berkshire/Guardian m.s.j., ex. 25-28; pl. dep. 383-95).  She subsequently changed attorneys and filed this lawsuit on August 12, 2008.  Her attorney's motion to withdraw was granted on August 28, 2009, and since that time, she has proceeded *pro se* in this action.

The plaintiff's revised claim in January 2006 answered a question asking her "Gross monthly earned income prior to disability" by stating, "none since 2004." (Berkshire/ Guardian m.s.j., ex. 19).  Her claim was accompanied by only two profit and loss statements dated November and December, 2005, which show only net losses (*id.*).  Since that time, the plaintiff did not provide any "before and after" financial information related to either her personal income or the income of Gaddy Law Firm, LLC, nor has the plaintiff provided any financial information related to legal work she has performed since moving to Charleston in April 2006.

After moving to Charleston in 2006, the plaintiff continued to see different doctors. In the course of this lawsuit, Berkshire/Guardian issued subpoenas for her medical records since 2006. The latest records from her current physician, Dr. Melissa Hunter, describe the plaintiff's condition (as of April 9, 2009) as "menopausal symptoms," hypothyroidism, and/or chronic fatigue syndrome (Berkshire/Guardian m.s.j., ex. 30 at 749-66). Dr. Hunter's notes also state that these symptoms "seemed to coincide after previous MVA and pregnancy loss 6 years ago" (*id.* at 765). When the plaintiff was asked in her deposition, "Where do you think Dr. Hunter got that information," she admitted, "me" (pl. dep. 405-406). During the last three years, the plaintiff has seen various other doctors who described her symptoms as allergies, idiopathic insomnia, rheumatism secondary to insomnia, chronic fatigue syndrome or fibromyalgia, and irritable bowels (Berkshire/Guardian m.s.j., ex. 21, 22, 23, 24, 31, 32, 33). The plaintiff does not dispute that Dr. Hunter's latest chart indicates her condition as menopausal symptoms (pl. dep. 404-11).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue.  *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### Consolidated's Motion for Summary Judgment

On May 18, 2009, the Honorable Henry M. Herlong, Jr., Senior United States District Judge, granted in part Consolidated's motion to dismiss.  The only causes of action

remaining against Consolidated are for breach of contract and negligent misrepresentation. Consolidated has moved for summary judgment on both claims.

The plaintiff alleges Ms. Frances Simon, as agent or employee of Consolidated, negligently misrepresented that the Physical Impairment Rider "existing on the policies would automatically be removed from the policies after two years of being in effect" (compl. ¶ 28). Consolidated denies this representation was made. In her deposition, the plaintiff conceded that possibly no misrepresentation was made. The plaintiff acknowledged she could have been confused and that Ms. Simon was possibly referring to the two-year preexisting condition limitation provision found in the policies. That provision provides:

**Preexisting Condition Limitation**
We will not cover any loss that begins in the first two years after the date of issue from a preexisting condition.

(Consolidated m.s.j., ex. 4, pl. dep. 484-85; ex. 1, GUARDIAN 00006; ex. 2, GUARDIAN 00035). The plaintiff testified the alleged statement was allegedly made "after the policy had been issued" (pl. dep. 469-70).

The rider the plaintiff claims she was told would be automatically removed from the policies after two years is entitled a "Physical Impairment Rider (Exclusion of Coverage)," which excluded benefits for "loss[es] resulting from any disability contributed to or caused by any mental or nervous disease or disorder." This rider is in both policies (Consolidated m.s.j., ex. 1, GUARDIAN 00017; ex. 2, GUARDIAN 00044). The plaintiff testified she read the riders and understood what they meant when she signed them, although she admitted does not remember if she read the policy (pl. dep. 453, 474). The plaintiff admits the language of the policies and the riders do not state the riders would be removed in two years after issuance. (*Id.* 476-79). She could not testify that, even if this exclusion was not removed in two years, she would have refused these policies (*id.* 480).

14

Berkshire/Guardian has not denied the plaintiff's disability claim based on the exclusions contained in the riders. Any reasons for Berkshire/Guardian to limit or deny benefits are based on other grounds (Consolidated m.s.j., ex. 5). The plaintiff testified she did not believe she had ever made a claim for a mental or nervous disorder that could fall under this exclusion (pl. dep. 412-13, 492). She was unable to testify to any pecuniary losses she had suffered as a result of this alleged misrepresentation (*id.* 498-501).

### Breach of Contract

With regard to the breach of contract claim, the plaintiff alleges, "Plaintiff and Defendants entered into a binding contract for two insurance policies written … [and] … Defendants agreed to procure insurance for the Plaintiff which would provide disability income and expense benefits" (compl. ¶¶ 15, 19). Further, "Defendants failed to provide the Plaintiff's benefits and; therefore, have breached their contract with Plaintiff" (compl. ¶ 20).

The plaintiff's breach of contract claim against Consolidated fails as a matter of law. The alleged contract of insurance was between Berkshire/Guardian and the plaintiff, not Consolidated. The plaintiff testified her contract was not with Consolidated (pl. dep. 452). Even if a contract existed, there is no evidence that Consolidated was the entity that denied the plaintiff's claim for benefits. Accordingly, the claim fails.

### Negligent Misrepresentation

The negligent misrepresentation claim also fails as a matter of law. To establish liability for negligent misrepresentation, a plaintiff must show:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the representation; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care;

15

> (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

*Sauner v. Pub. Serv. Auth. of South Carolina*, 581 S.E.2d 161, 166 (S.C. 2003) (internal quotation marks omitted).

The plaintiff alleges Consolidated's agent, Ms. Simon, negligently misrepresented that "riders existing on the policies would automatically be removed from the policies after two years of being in effect" (compl. ¶ 28). Here, as argued by Consolidated, the alleged misrepresentation was not the basis for any denial of benefits, and the plaintiff cannot articulate any pecuniary losses as a result of the alleged misrepresentation. In addition, there is no evidence the plaintiff would not have accepted the policies even if the riders would remain after two years (pl. dep. 480). Further, the plaintiff testified the alleged misrepresentation was made *after* the policies had been issued, and thus she cannot show that the alleged misrepresentation induced her to accept the policies (*id.* 469-70).

It is axiomatic that "[o]ne cannot complain of fraud and misrepresentation in the contents of a document if the truth could have been ascertained by reading it." *Burwell v. South Carolina Nat'l Bank*, 340 S.E.2d 786, 789 (S.C. 1986) (citing *Reid v. George Washington Life Ins. Co.*, 109 S.E. 577 (S.C. 1959)). The facts in this case are similar to the case of *Doub v. Weathersby-Breeland Ins. Agency*, 233 S.E.2d 111 (S.C. 1977). In *Doub*, the plaintiff conceded the exclusion in the case was valid and brought an action for fraud and misrepresentation against the agent (*id.* at 112). The plaintiff admitted that he never read the policy (*id.* at 113). The agent moved for a directed verdict on two grounds: (1) plaintiff had no right to rely on oral misrepresentation as to the coverage when the written terms were in his possession and available to him; and (2) there was no evidence of a detrimental change of position in reliance on those misrepresentations (*id.* at 114). The Supreme Court recognized:

> [O]ne cannot complain of fraud in the misrepresentation of the contents of a written instrument in his possession when the truth could have been ascertained by reading the instrument. One entering into a contract should read it and avail himself of every reasonable opportunity to understand its contents and meaning.

(*Id.*).  The court noted further "plaintiff had eighteen months to inform himself as to the terms, conditions and exclusions in the written contract to which he was a party.  He made no effort to do so, and never read the contract" (*id.*).

Here, when asked if she read the policies, the plaintiff testified:  "I don't remember specifically whether I read [the policies] upon receipt or not" (pl. dep. 453). Nevertheless, the plaintiff admitted that nowhere do the policies (including the riders) indicate this exclusion would be automatically removed in two years.  In fact, the policies expressly provide any amendments to the policies must be made in writing and that the terms of the written policies supersede any representations of an agent (pl. dep. 476-79). Further, the policies clearly state:

> **Entire Contract; Changes**
> This policy with its riders and attached papers, if any, are the entire contract of insurance. No change in this policy will be valid unless it has been endorsed on or attached to this policy in writing by the president, a vice president, or the secretary of The Guardian.
>
> No agent has authority to change this policy or waive any of its provisions.

(Consolidated m.s.j., ex. 1, GUARDIAN 00030; ex. 2, GUARDIAN 00058).  The plaintiff understood and recognized this provision was contained in her policies (pl. dep. 458-60). She cannot complain of misrepresentation since the truth could have been discovered by reading the policies.  Thus, the plaintiff was not justified in her reliance and cannot maintain an action based on the alleged oral representation of the policies' written terms.

Lastly, the plaintiff cannot prove a false statement was made.  In her deposition, the plaintiff testified that Ms. Simon was "possibly" referring to the two-year

preexisting condition limitation provision found in the policy (pl. dep. 484-85). If so, no false statement was made because this condition is clearly provided in the written policies. Without any competent evidence to the contrary, no genuine issue of material fact exists that any false statement was communicated to the plaintiff.[1]

## Plaintiff's Motions for Summary Judgment Against Consolidated

In response to Consolidated's motion for summary judgment, the plaintiff filed a memorandum in opposition (doc. 85). The plaintiff, however, does not raise any issue of material fact as to her claims against Consolidated. Instead, the plaintiff raises new, unsubstantiated allegations against Consolidated and entities that are not parties to this action. She also filed a motion for summary judgment against Consolidated (doc. 84). In that motion, again, the plaintiff makes new, unsubstantiated allegations against Consolidated and other entities that are not parties to this lawsuit. She does not address the merits of the claims against Consolidated raised in her complaint. On March 31, 2010, the plaintiff filed an amended motion for summary judgment against all the defendants (doc. 133). In that motion, the plaintiff again raises new allegations against entities that are not parties to this action.

Based upon the foregoing, this court recommends that Consolidated's motion for summary judgment (doc. 80) be granted. Further, and for the same reasons, this court recommends that the plaintiff's motion for summary judgment against Consolidated (docs. 84, 133) be denied.

---

[1]As this court has recommended dismissal on the merits, Consolidated's argument that the claim is barred by the statute of limitations has not been addressed.

**Berkshire and Guardian's Motion for Summary Judgment**

All of the plaintiff's claims relate to her assertion that she is entitled to receive residual disability benefits under the policies. Based on this belief, the plaintiff alleges claims against Berkshire/Guardian for breach of contract, bad faith failure to pay insurance benefits, improper claims practices, breach of fiduciary duty, negligent misrepresentation, and waiver and estoppel. Berkshire/Guardian has moved for summary judgment on these claims.

*Breach of Contract*

To recover for breach of contract the plaintiff must establish the following three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damages suffered by the plaintiff as a direct and proximate cause of the breach. *Tidewater Supply Co. v. Industrial Elec. Co.*, 171 S.E.2d 607 (S.C. 1969).

In submitting a claim for residual disability benefits and alleging breach from Berkshire/Guardian's non-payment, the plaintiff bears the burden of proving she satisfied all of the terms and conditions of the insurance policies and therefore was legally entitled to disability benefits. *Massachusetts Mut. Life Ins. Co. v. Bussell*, No. CV 08-1041-R, 2008 WL 4820771, *8 (C.D. Cal. 2008); *Napoli v. First Unum Life Ins. Co.*, No. 99 Civ. 1329(GEL), 2005 WL 975873, * 7 (S.D. N.Y. 2005). Specifically to this matter, the plaintiff has the burden of demonstrating that she properly submitted a claim that established (1) she suffered a new disabling sickness that was not merely a recurrence of an old claim she already had released more than six months prior; (2) she had suffered a new loss of income that met the requisite conditions of the policy; and (3) her new disabling sickness was the cause of her income loss, as opposed to other causes (Berkshire/Guardian m.s.j., ex. 2, 3).

As argued by the defendants, the plaintiff's new claim is a continuation of her prior claim. Pursuant to the policies, a period of disability is considered "recurrent" if it results "from the same cause or causes and are not separated by a recovery of more than six months" (*id.*). The undisputed facts are as follows:

> • As a result of the plaintiff's motor vehicle accident in October, 2002, she received disability benefits from Guardian from November 2002 to October 2004. On October 13, 2004, the plaintiff signed a Claim Release Agreement, "fully, finally, and unconditionally releas[ing] and forever discharg[ing] Guardian [and Berkshire] . . . from any and all claims, demands, liabilities, agreements, . . . arising out of or in any way related to the Claim under the Policy . . ." (Berkshire/Guardian m.s.j., ex. 9). It further provided that any recurrence claim would be subject to all the terms and conditions of the policy, including that the recurrence must happen within six months to be eligible for payment.

> • The plaintiff thereafter made a decision to invest in real estate on the coast, close her Greenville law practice, and move to Charleston. The plaintiff soon decided to ask Guardian to "re-open" a previous disability claim (*id.*, ex. 11).

> • On September 19, 2005, the plaintiff submitted a Disability Claim Statement that provided that her alleged disability was due to her 2002 rear-end collision, causing "injuries to neck, shoulder and back" (*id.*, ex. 19; pl. dep. 296-97). Once she was reminded of the terms of the Recurrent Claims provision in the policies, she submitted a new Disability Claimant's Statement on January 12, 2006, seeking benefits based on "memory loss" (Berkshire/Guardian m.s.j., ex. 19).

> • However, the plaintiff admitted to her doctors, as recorded in their charts, that her complaints ("injuries to neck, shoulder and back" and "memory loss") all related to her 2002 automobile accident (pl. dep. 301, 306-309; Berkshire/Guardian m.s.j., ex. 13-15). The plaintiff also admitted during her deposition that there was no difference between her first claim for back pain regarding her automobile accident and her subsequent complaints of back pain in 2005 (pl. dep. 296-97, 315). The plaintiff also represented to Dr. Wallace on October 4, 2005 that her "memory problems" began three years prior, at the time of her automobile accident (*id.* 308-309; Berkshire/Guardian m.s.j., ex. 14).

• As recently as 2008 and 2009, in records obtained from the plaintiff's doctors since the filing of her lawsuit, it appears she represented to Dr. Hunter that her then present symptoms related to her 2002 automobile accident and miscarriage (Berkshire/Guardian, ex. 30 at 749-66).

Based upon the foregoing, the plaintiff's current claim for disability benefits relates to her prior 2002 claim for benefits, which she previously released. Her claim for residual disability benefits is, therefore, barred by the Recurrent Periods of Disability provision.

Furthermore, even if the plaintiff's new claim were treated as an entirely new condition that had not previously been released, Berkshire/Guardian is entitled to summary judgment because her new claim did not satisfy the terms and conditions of the policies to be entitled to payments. The policies require that a new disabling sickness underlying her claim must precede (and cause) a decline in income, not vice versa. It is not enough that one becomes sick after suffering a reversal of fortunes or a sudden loss of income. Further, the policies are not satisfied by evidence that one's sickness even coincides with an income decline. There must be a causal relationship to meet the requisite conditions of the policies. If there were other causes of decline in the plaintiff's earnings, such as, for example, closing her law office, moving to another city, termination of a major client, reversal of the real estate market, or a family situation that interfered with her financial goals – or any combination thereof – the plaintiff is not eligible for residual disability benefits that she claims.

The requirements of these policies are tied to a specific date of disability on which a claimant must demonstrate that she was diagnosed by a physician as having a disabling sickness and that the sickness caused the requisite loss of income, and she must remain under the regular care of a physician for treatment of such sickness during the dates of her claimed disability. The plaintiff's second claim reveals that no doctor had diagnosed

her with a new disabling "sickness" at the time she filed her claim. At best, the plaintiff was diagnosed with a symptom – "memory loss" – and not a condition (Berkshire/Guardian m.s.j., ex. 19; pl. dep. 338-39). By February 23, 2006, the plaintiff advised Guardian that she was not disabled, but rather had just suffered an allergic reaction (Berkshire/Guardian m.s.j., ex. 20). From January 2006 to October 2006, the plaintiff sought treatment related only to her allergies (*id.*, ex. 21-24).

The plaintiff enclosed with her January 12, 2006, Disability Claimant's Statement two profit-and-loss statements for the two months (November and December 2005) preceding her alleged disability (*id.*, ex. 19). Both statements reflect losses. The plaintiff's claim also contained a statement, in response to a question asking the amount of her "gross monthly earned income (before taxes, after business expenses)," in which she answered "none since 2004." Since submitting her claim, the plaintiff has provided no "before and after" monthly financial information indicating that she experienced a decline in income because of the claimed sickness for which she reported an onset in 2005.

In the absence of sufficient accurate information about the plaintiff's claimed sickness and her alleged date of disability, and her further failure to produce reliable information about her personal and business finances "before and after" the date of the alleged disabling sickness, it is impossible to compare and analyze that information to determine whether she satisfied the causation requirement of showing that her income decline was "because of" the alleged disabling sickness – particularly when she acknowledges having received no income since 2004. As a result, there is no basis to conclude that the plaintiff's claim satisfied her burden under the policies such that Berkshire/Guardian breached the contract by failing to pay benefits on her claim. *See Schwartz v. New York Life Ins. Co.*, Civil No. 3:01-cv-10084, 2003 WL 25275947, *4 (S.D. Iowa 2003) (summary judgment granted on claim for residual disability benefits where plaintiff failed to produce financial information showing requisite loss of income).

22

Lastly, the plaintiff testified in her deposition that her claim for disability is not based on a mental or nervous disorder (pl. dep. 412-13, 492). As argued by the defendants, such a claim would not be covered anyway, as the plaintiff's policies were underwritten with an express exclusion for such claims. The "Physical Impairment Rider" excludes all claims arising from any mental and nervous disease or disorders, including but not limited to claims of "psychosis, anxiety, depression, or any mental, emotional, cognitive, adjustment, or mood disorder, or chronic fatigue syndrome or any somatic complaints arising therefrom" (Berkshire/Guardian m.s.j., ex. 2, 3). Further, the Diagnostic and Statistical Manual of Mental Disorders referenced in the Physical Impairment Rider includes a section on "amnestic disorders," which encompasses any claim for disability based on a symptom of "memory loss" (*id.*, ex. 34 at 171-80). Based upon the foregoing, the breach of contract claim fails.

### Bad Faith Refusal to Pay Benefits

To establish liability for bad faith refusal to pay benefits, the plaintiff must establish the following:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Mixson, Inc. v. Am. Loyalty Ins. Co.*, 562 S.E.2d 659, 661 (S.C. Ct. App. 2002) (quoting *Howard v. State Farm Mut. Auto. Ins. Co.*, 450 S.E.2d 582, 586 (S.C. 1994)) (internal quotation marks omitted).

Even if an issue of material fact existed on the breach of contract claim, summary judgment would be appropriate on this claim because the plaintiff has shown no evidence of bad faith. The classic statement of law in a bad faith action is that "[i]f there is

a reasonable ground for contesting a claim, there is no bad faith in the denial of it." *Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 397 (S.C. 1992).

Here, the plaintiff herself has acknowledged that Berkshire/Guardian had a reasonable basis for questioning her second claim as presented (pl. dep. 312-16). In addition, although the plaintiff failed to provide sufficient evidence to support her claim of a new disabling sickness or sufficient financial information that her sickness caused her decline in earnings, Berkshire/Guardian continued to remain in contact with her (Berkshire/ Guardian, ex. 25-28). Berkshire/Guardian followed up with the plaintiff often, spoke to her by telephone numerous times, and sent the plaintiff and her attorneys multiple letters outlining the information needed to consider whether the claim was payable (*id.*; *see also* ex. 11, 16, 20 and 35). In addition, a Guardian field representative met personally with the plaintiff to go over her claim and discuss the information needed to support her claim for benefits (*id.*, ex. 18). Despite the defendants' efforts, the plaintiff has never provided further medical or financial proof that she meets the conditions required in the policies for payment of benefits. Accordingly, Berkshire/Guardian's actions were reasonable as a matter of law, and the plaintiff's bad faith claim fails.

### Improper Claims Practice

Berkshire/Guardian next moves for summary judgment on the plaintiff's claim for improper claims practice under the Improper Claims Practices Act, S.C. Code Ann. § 38-59-20, *et seq.* (the "Act"). The plaintiff alleges that due "to the acts of the Defendants in refusing to pay legitimate claims, Defendants have violated [the] Improper Claims Practice[s] [Act]" (compl. ¶ 40). However, "section 38-59-20 does not create a statutory private cause of action for first-party claimants" like the plaintiff. *Ocean Winds Council of Co-Owners, Inc. v. Auto-Owners Ins. Co.*, 241 F.Supp.2d 572, 578 (D.S.C. 2002). Accordingly, the claim fails as a matter of law.

24

### Breach of Fiduciary Duty

The plaintiff alleges that the defendants "owed a fiduciary duty to Plaintiff to provide the insurance benefits requested" and "breached their fiduciary duty by not providing the insurance benefits for which the policies purchased by the Plaintiff were to provide" (compl. ¶¶ 22, 25). "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987).

As set forth above, the defendants had a reasonable basis for questioning the plaintiff's second claim as presented. Assuming for purposes of this motion that Berkshire/ Guardian had a fiduciary relationship with the plaintiff, the plaintiff has failed to show any breach of that duty. Accordingly, summary judgment should be granted to the defendants on this claim.


### Negligent Misrepresentation

The plaintiff alleges that the defendants "misrepresented to Plaintiff that riders existing on the policies would automatically be removed from the policies after two years of being in effect" (compl. ¶ 28). To establish liability for negligent misrepresentation, a plaintiff must show:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the representation; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

*Sauner*, 581 S.E.2d at 166.

The plaintiff's claim of negligent misrepresentation is predicated on the existence of the Physical Impairment Rider in the policies (compl. ¶ 28), which precludes recovery for mental or nervous disorders or diseases. As discussed above with regard to defendant Consolidated, the plaintiff's claim is moot, however, by reason of her own admission that her claim for disability is not based on any mental or nervous disorder (pl. dep. 412-413, 492). Thus, the presence of the Physical Impairment Rider is immaterial, and the plaintiff has not been damaged because she has not asserted that she suffers from any such disability. Further, the claim fails for lack of justifiable reliance. The plaintiff testified that she understood the meaning of the Physical Impairment Rider at the time she signed (*id.* at 474). Further, she admitted that the Physical Impairment Rider language does not indicate that it will be removed in two years (*id.* at 476). Moreover, the plaintiff agreed that nowhere in the policies does it provide that the Physical Impairment Rider would be removed two years after the issuance date of the policies (*id.* at 478-79). Based upon the foregoing, summary judgment should be granted to the defendants on this claim.

### *Waiver and Estoppel*

In her waiver and estoppel claim, the plaintiff alleges that the defendants "due to their improperly processing the policies of insurance and misrepresentations regarding the riders thereon, have waived any right and defense to denying the claims" (compl. ¶ 42). "Waiver is the voluntary and intentional relinquishment of a known right . . . . Waiver, like estoppel, is an affirmative defense and the burden of proof is upon the party who asserts it." *Provident Life and Accident Ins. Co. v. Driver*, 451 S.E.2d 924, 928-29 (S.C. Ct. App. 1994).

Under South Carolina law, the general rule is that insurance coverage may not be created or enlarged by waiver or estoppel. *Campbell, Inc. v. Northern Ins. Co. of New York*, 337 F. Supp. 2d 764, 769-70 (D.S.C. 2004) ("'The weight of authority is said to

support the view that the coverage, or restrictions on the coverage, cannot be extended by the doctrine of waiver or estoppel. To the same effect[,][i]t has been broadly stated that the doctrines of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability, but may only affect rights reserved therein.... [U]nder no conditions can the coverage or restrictions on coverage be extended by waiver or estoppel.'") (quoting *Pitts v. New York Life Ins. Co.*, 148 S.E.2d 369, 371 (S.C. 1966)). The plaintiff admitted in her deposition that her claim is subject to the terms and conditions of the written policies (pl. dep. 453, 459). There simply is no evidence to support her claim that she is entitled, due to waiver or estoppel, to benefits beyond the policy terms. Accordingly, the claim fails.

### Plaintiff's Motion for Summary Judgment Against Berkshire/Guardian

In response to Berkshire/Guardian's motion for summary judgment, the plaintiff filed a memorandum in opposition (doc. 126). The plaintiff, however, does not raise any issue of material fact as to her claims against these defendants. Instead, the plaintiff raises new, unsubstantiated allegations against Berkshire/Guardian and the insurance industry in general. She also filed a motion for summary judgment against Berkshire/ Guardian (doc. 124). In that motion, the plaintiff makes irrelevant allegations against entities that are not parties to this lawsuit. On March 31, 2010, the plaintiff filed an amended motion for summary judgment against all the defendants (doc. 133). In that motion, the plaintiff again raises new allegations against entities that are not parties to this action. The plaintiff has failed to show that she is entitled to summary judgment on her claims against Berkshire/Guardian and has further failed to raise issues of material fact so as to prevent summary judgment in favor of Berkshire/Guardian.

Based upon the foregoing, this court recommends that summary judgment be granted in favor of Berkshire/Guardian (doc. 97) on its counterclaim for declaratory

judgment and the plaintiff's complaint. Further, and for the same reasons, this court recommends that the plaintiff's motions for summary judgment against Berkshire/Guardian (docs. 124, 133) be denied.

## Plaintiff's Motions for Sanctions

The plaintiff has filed two motions for sanctions against the defendants (docs. 103, 111). In the motions, the plaintiff makes irrelevant allegations against the defendants and other nonparty entities. Further, she fails to identify the failure by any party or attorney to comply with any court-ordered obligation or deadline that could serve as the basis for sanctions. The motions are meritless and are therefore denied.

## <u>CONCLUSION</u>

Wherefore, based upon the foregoing,

IT IS RECOMMENDED that the defendants' motions for summary judgment (docs. 80, 97) be granted, and the plaintiff's motions for summary judgment (docs. 84, 124, 133) be denied. Further,

IT IS ORDERED that the plaintiff's motions for sanctions (docs. 103, 111) are denied.

The plaintiff's remaining pending nondispositive motions (docs. 104, 109, 127) will be held in abeyance pending the district court's disposition of the motions for summary judgment. Should the district judge adopt this court's recommendation, these nondispositive motions will be rendered moot.

June 9, 2010                                         s/Kevin F. McDonald
Greenville, South Carolina                      United States Magistrate Judge

28